FILED'10 MAR 3 14:57USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| CHARLOTTE CORDRAY, | ) | Civil No. 08-1386-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Martin R. Cohen
4040 Douglas Way
P.O. Box 1229
Lake Oswego, OR 97035

Linda S. Ziskin
3 Monroe Parkway, Suite P, PMB #323
Lake Oswego, OR 97035

Attorneys for Plaintiff

FINDINGS AND RECOMMENDATION - 1

Dwight Holton
Acting U.S. Attorney
District of Oregon
Adrian L. Brown
Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

Michael S. Howard
Special Asst. U.S. Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

      Plaintiff Charlotte Cordray brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits (DIB) and supplemental security income (SSI). Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits. In the alternative, she seeks an Order remanding the action for further proceedings.

      For the reasons set out below, the decision of the Commissioner should be affirmed.

## Procedural Background

      Plaintiff filed applications for DIB and SSI on September 26, 2000, and August 21, 2001. After those claims were denied initially, plaintiff did not seek further review. Those claims are therefore not at issue in this action.

FINDINGS AND RECOMMENDATION - 2

On November 4, 2003, plaintiff filed the applications for benefits that are currently at issue, alleging that she had been disabled since December 1, 2002. After these applications were denied initially and upon reconsideration, plaintiff timely requested a hearing before an Administrative Law Judge (ALJ).

A hearing was held before ALJ Mason Harrell, Jr., in Portland, Oregon, on August 11, 2006. Plaintiff; Kathy Eastman, plaintiff's health therapist; David Glassmire, M.D., an independent medical expert (ME); and Patricia Ayerza, a vocational expert (VE); testified at the hearing.

In a decision filed on October 17, 2006, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act (the Act) because she could perform her past relevant work, or, alternatively, could perform other jobs that existed in substantial numbers in the national economy. That decision became the final decision of the Commissioner on October 30, 2008, when the Commissioner denied plaintiff's request for review. Plaintiff brought this action to challenge that decision.

**Factual Background**

Plaintiff was born on May 5, 1976, and was 30 years old at the time of the hearing before the ALJ. She graduated from high school, and earned a certificate from a business college. Plaintiff has past relevant work experience as a kitchen helper, hostess, busser, housekeeper, caregiver, transcriptionist, and billing clerk. She last worked in 2002.

In the applications at issue here, plaintiff alleged that she was disabled because of post-traumatic stress disorder (PTSD); major depression, recurrent; anxiety disorder; psychotic tendencies; "people phobia"; extreme tiredness; and memory loss. Though plaintiff

has documented back and hip pain, headaches, and gynecological problems, she bases her claim of disability primarily on psychological problems.

### Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

<u>Step One</u>.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

<u>Step Two</u>.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

<u>Step Three</u>.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four. The Commissioner determines whether the claimant is able to perform work he or she has done in the past. A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five. 20 C.F.R. § 404.1520(e).

Step Five. The Commissioner determines whether the claimant is able to do any other work. A claimant who cannot perform other work is disabled. If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

## **Medical Record**

Because plaintiff alleges that she is disabled as a result of psychological problems, the brief summary of the medical record below will focus on the evidence concerning plaintiff's psychological condition.

Shirl Proctor, MSW

Shirl Proctor, MSW, a therapist, began treating plaintiff in 1999. In a letter to Adult and Family Services of Oregon dated September 28, 2000, Ms. Proctor stated that plaintiff had a "mental health disability and can not be stressed with any more responsibilities such as job training or job seeking." She stated that plaintiff "suffers from a major depression disorder, which is chronic at this stage and should be monitored with appropriate rest, weekly therapy and medication." Ms. Proctor added that plaintiff's focus "should only be the care of her two children with positive support from family members in addition to therapy." She stated that plaintiff was "sound minded about her children and their daily care," and opined that, with treatment over time, plaintiff's condition could possibly improve. Ms. Proctor reiterated that, until that time, plaintiff needed to be "protected from any and all additional stress in her life."

Dr. Kolilis

Duane Kolilis, Ph.D., a licensed psychologist, evaluated plaintiff on March 28, 2001, and December 13, 2001. Based upon an interview and review of plaintiff's medical records, in the first evaluation, Dr. Kolilis diagnosed plaintiff with Adjustment Disorder with Depressed Mood; Malingering; and Personality Disorder NOS; with Borderline, Dependent, and Anti social Features. He rated her then-current GAF at 65. Dr. Kolilis noted that plaintiff reported a childhood history of molestation and abuse, reported work problems, and stated that she had been arrested for prostitution. Dr. Kolilis noted that plaintiff appeared to be "either extremely sleepy or under the influence of something," and found her to be guarded, evasive, and passive-aggressive during the interview. He characterized her

judgment as poor, and noted that she tended to endorse every problem she was asked about. Dr. Kolilis opined that plaintiff was exaggerating and malingering. He also opined that plaintiff could understand and follow "at least simple 1-2 step instructions," and estimated that she was "functioning in the Average range of intellectual abilities."

In his second evaluation, Dr. Kolilis diagnosed Adjustment Disorder with Depressed Mood, improved; and Personality Disorder NOS, With Borderline, Dependent, and Antisocial Features. He rated her then-current GAF at 75. Dr. Kolilis did not diagnose malingering as he had in the first evaluation, and reported that plaintiff appeared to be sincere and honest in response to his questions. Though he again characterized her judgment as poor, he thought that plaintiff presented as significantly improved, and that there was no evidence of psychopathology limiting her ability to function.


Dr. Wong-Ngan

On April 21, 2005, Dr. Julia Wong-Ngan, Ph.D, a clinical neuropsychologist, conducted a neuropsychological consultation and tested plaintiff for learning disabilities and cognitive dysfunctions. Dr. Wong-Ngan opined that there was no evidence of malingering on the tests. Most of plaintiff's test scores were in the average range, except for the Minnesota Multiphasic Personality Inventory (MMPI-2) score, which was found to be of "questionable validity" because plaintiff endorsed a significant number of atypical or bizarre items. Dr. Wong-Ngan stated that the MMPI-2 result "could imply exaggeration of distress, plea for help, but also possibly serious psychopathology."

Dr. Wong-Ngan found no evidence of learning disabilities or cognitive impairments. However, she thought that plaintiff's reports of problems with memory, concentration, and

confusion "probably reflect her other psychiatric conditions." She diagnosed PTSD and Major Depression versus Paranoid Schizophrenia, and opined that plaintiff might have "a paranoid schizophrenia, onset around 2000." Dr. Wong-Ngan added that

> Around that time, she apparently developed paranoid symptoms that interfered with employment. She had some type of breakdown that led to hospitalization. She started hearing voices and seeing shadows about that time. She continues to complain of paranoid ideation, and also alludes to ideas of reference and thoughts broadcasting. Cognitive problems and confusion might also be better explained by this.

### Hearing Testimony

1. Plaintiff

Plaintiff testified as follows at the hearing.

Plaintiff was 30 years old at the time of the hearing. She graduated from high school, and attended a business college. Plaintiff has worked as an office clerk in a VA hospital. In that position, she worked with a supervisor and five co-workers, with whom she got along. Plaintiff was terminated from this position because the job required that she also attend school, and she had stopped attending. She cannot work now because she feels paranoid around people, and feels like they are looking at her. Plaintiff has felt paranoid for five years or longer, and thinks she would get sick if she started working again.

Plaintiff lives with her children, who are ages 5, 7, and 9. She takes Wellbutrin, Prozac, and Seroquel for her psychiatric problems. The medicines help a little, and sometimes she feels less paranoid. Everything is stressful for plaintiff, and her stress increases when she has more to deal with. Plaintiff usually takes three naps a day. She enjoys painting and reading, and can drive for 20 to 30 minutes at a time. Plaintiff is able to do some cooking, and cleans her house once a week.

FINDINGS AND RECOMMENDATION - 8

2. <u>Kathy Eastman, therapist</u>

Kathy Eastman, plaintiff's therapist, testified as follows at the hearing.

Ms. Eastman has a Master's Degree in counseling and psychology. She treated plaintiff about three times a month, and had been treating her for about 2 1/2 years before the hearing. Ms. Eastman treated plaintiff for the symptoms of PTSD, which had been caused by childhood abuse, and worked with her on parenting issues, stress, and general life problems.

Ms. Eastman observed that plaintiff's problem with paranoia seemed to occur when she was "overwhelmed with life things; taking care of the children, just dealing with daily stuff, behaviors in her children." She had not observed paranoia during the therapy sessions with plaintiff, but based her conclusions about it on plaintiff's concerns with such issues as security in her apartment and the locks on her doors. Ms. Eastman reported that plaintiff tended to hear voices sometimes, and thought people were watching her and talking about her. She agreed with the diagnoses of depression, PTSD, and psychotic tendencies that had been made by other therapists, and opined that plaintiff's paranoia sometimes reached a psychotic level when plaintiff became overwhelmed by situations or experiences. Ms. Eastman noted that plaintiff had sought treatment for paranoia at a hospital in 2000.

Ms. Eastman stated that plaintiff sometimes had hallucinations during which she saw figures, heard voices, and experienced a "feeling of not being inside herself . . . so she seems to have a sort of disassociative state there." Seroquel had been prescribed to treat hallucinations and "a feeling of different kinds of personalities inside of herself . . . ." Plaintiff experienced such symptoms whenever she encountered a stressful situation or "when it just becomes too much for her with the children." Social situations were stressful for plaintiff.

3. <u>Dr. David Glassmire, ME</u>

Dr. Glassmire testified as an independent medical expert (ME). He described plaintiff's medically determinable psychological impairments as including a major depressive disorder under Listing 12.04 and an anxiety disorder, not otherwise defined, under listing 12.06. Dr. Glassmire stated he had considered a diagnosis of personality disorder NOS based upon the psychological evaluation of Dr. Kolilis, but had rejected that diagnosis because from Ms. Eastman's testimony and because "the record . . . sounds more longitudinal . . . ."

Evaluating the "B" criteria of the Listings, Dr. Glassmire opined that plaintiff had mild restriction of activities of daily living; marked difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace; and "one or two" episodes of decompensation.

Citing Ms. Eastman's testimony and the longitudinal record, Dr. Glassmire opined that plaintiff did not meet the "C" criteria of the Listings. On examination by plaintiff's counsel, the ME stated that, though plaintiff satisfied the first three elements of the "C" criteria, he did not think she satisfied the fourth element, which is met by "a residual disease process that has resulted in such a marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate." Though he agreed that work could constitute such a factor, Dr. Glassmire opined that a job that met certain restrictions which he recommended would not cause plaintiff to decompensate. The suggested restrictions were:

-object-oriented as opposed to "people-oriented" work;

-no tasks requiring "hyper-vigilance";

-no "fast-paced" work, or, stated affirmatively, work performed at a "relaxed pace";

FINDINGS AND RECOMMENDATION - 10

-no contact with the public;

-only occasional contact with co-workers or supervisors;

-no significant responsibility for others;

-work involving only simple tasks, though plaintiff could perform complex tasks

except when her symptoms were worse.

Dr. Glassmire testified that these restrictions limited plaintiff to a "relatively low-stress type job," and that "other stresses" in plaintiff's life would cause plaintiff to miss work once or twice a month.  He stated that he did not "completely agree" with plaintiff's therapist's opinion that plaintiff's illness was "recurrent and a decompensation could be triggered at any time . . . ."  Dr. Glassmire opined that, though work could "become stressful," it would not cause plaintiff to experience "frequent decompensation" if she worked at a position that was consistent with the limitations set out above.


4. <u>Patricia Ayerza, VE</u>

The ALJ posed the VE a hypothetical describing an individual who had a high school education and was limited to "object oriented work" that did not require hyper-vigilance, was not fast paced, required no public contact and only occasional contacts with co-workers and supervisors, involved no significant responsibilities for other people, and was limited to simple tasks.

The VE testified that the hypothetical individual could perform plaintiff's past relevant work as a kitchen helper, busser, and housekeeper.

FINDINGS AND RECOMMENDATION - 11

Upon examination by plaintiff's counsel, the VE testified that an individual who missed work once a month on an "unscheduled basis" could maintain employment, but that two such absences per month would cause "issues with retention."

When asked whether work as a kitchen helper was performed at a fast or relaxed pace, the VE said, "Well this is a very good question. I am trying to basically determine what that means myself." She added, "I think that it's more relaxed than say something that would be intensely focused and would be more complex. So if, you know, every kind of work has - - people don't, don't pay you to be a slow worker - - so every kind of work has some expectations regarding production. I think that this is less and less a stressful in that area than say lots of more semi-skilled jobs would be such as the office clerk job that she did for example. So if you're going to say there can't be any production issues at all then I'd have to say she's unemployable." Upon further questioning, the VE testified that in both the kitchen helper and busser positions, there were times when "you have to work very quickly," and that this was true for "just about" every job.

The VE then stated that she understood the ALJ's hypothetical to indicate that "simple tasks are okay in terms of fast pace," adding "that's what I'm assuming that it's not intense work but maybe he's the decision maker . . . so . . . we'll let him decide." Upon further questioning by plaintiff's counsel, the VE testified that an individual who had to take unscheduled breaks of 15 minutes or more every hour or hour and a half would not be "competitively employable in these kinds of jobs."

In response to further questioning by the ALJ, the VE testified that approximately 50% of the positions in certain jobs, such as housekeeping, janitorial, and laundry worker

positions, did not require periods of fast paced activity, and could be described as "leisurely paced work."

## ALJ's Decision

At the first step of his disability analysis, the ALJ found that plaintiff met the requirements for DIB eligibility through March 31, 2005, and that she had not engaged in substantial gainful activity since the date of the alleged onset of her disability.

The ALJ next found that plaintiff had a severe impairment, which he described as "major depression, which is occasionally associated with psychotic features, and anxiety disorder."

At the third step of his disability analysis, the ALJ found that plaintiff's impairments did not meet or medically equal an impairment listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.

At the fourth step of his analysis, the ALJ assessed plaintiff's residual functional capacity. He found that plaintiff "is limited to object-oriented work; cannot do work requiring hypervigilance or fast-paced work; is precluded from work requiring public contact; may have occasional contact with co-workers and supervisors; cannot perform work requiring her to take responsibility for others; and is limited to simple work. She has no physical limitations." Based on this RFC assessment, the ALJ concluded that plaintiff could perform her past relevant work as a kitchen helper, busser, and housekeeper.

In the alternative to his finding at step four, the ALJ proceeded to a step five analysis of whether plaintiff could perform other work that existed in substantial numbers in the national economy. The ALJ found that, assuming plaintiff could not perform her past

relevant work, she could work as a janitor or a laundry worker.  He noted the numbers of

these jobs that exist nationally and locally, and noted the VE's testimony "that 50% of these

jobs would be eroded by the fast-paced requirement."

Based upon these findings, the ALJ concluded that plaintiff was not disabled within

the meaning of the Social Security Act.


### Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity

by reason of any medically determinable physical or mental impairment which . . . has lasted

or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her

disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122

(1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan,

924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper

legal standards and the findings are supported by substantial evidence in the record as a

whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is

such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it

supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771,

772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if

"the evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

## <u>Discussion</u>

Plaintiff contends that the ALJ failed to accurately assess her impairments and consequently failed to make an accurate finding at step three of the disability analysis, erred in concluding that she could perform her past relevant work at step four and alternatively could perform other work at step five, relied on VE testimony that was not consistent with the Dictionary of Occupational Titles (DOT), erred in failing to comply with Social Security Ruling (SSR) 00-4p, improperly evaluated the testimony of Ms. Eastman, and failed to comply with SSR 06-3p.

1. <u>ALJ's Conclusion that Plaintiff Could Perform Past Relevant Work (step four) and Other Work (step five)</u>

a. <u>Past Relevant Work</u>

The VE's testimony at plaintiff's hearing was not a model of clarity. As plaintiff correctly notes, the VE at one point testified that "if you're saying that this hypothetical person can't do any fast paced work of any kind then I'd have to agree that she is not employable because every single employer is going to have quotas, is going to have production issues." The VE also testified that plaintiff's past relevant work as a busser and kitchen helper did occasionally require fast-paced work. In addition, plaintiff correctly notes that, after setting out a hypothetical in which he precluded "fast-paced" work, the ALJ later characterized the positions that the VE cited as satisfying that requirement as jobs which "hardly ever" require work at a fast pace.

FINDINGS AND RECOMMENDATION - 15

Given the VE's testimony that the busser and kitchen helper positions both required fast-paced work at times, I agree with plaintiff's contention that these positions do not satisfy the "no fast-paced" limitation in the ALJ's hypothetical, and agree that the ALJ erred in concluding that plaintiff can perform this work. However, though the ALJ later characterized the limitations he imposed as requiring only occasional fast-paced work, I am satisfied that the ALJ properly relied upon VE testimony that established that plaintiff could perform her past relevant housekeeping position. The VE testified that housekeeping jobs were performed at a "slower pace" than the busser and kitchen helper work, and responded affirmatively to the ALJ's inquiry as to whether that position allowed "a long enough period to do it in, you don't have to work at a fast pace . . . in order to clean the rooms?" The VE testified that the housekeeping position did not require fast-paced work even before the ALJ appeared to slightly modify his hypothetical to allow for very occasional fast-paced work. Accordingly, the VE's testimony was consistent with an RFC precluding all fast-paced work. Under these circumstances, the ALJ's conclusion that plaintiff could perform her past relevant work as a housekeeper was supported by substantial evidence in the record, and the ALJ did not err in concluding that plaintiff is not disabled within the meaning of the Act.

The VE's testimony that an individual who could not perform fast-paced work would be unemployable does not undermine this conclusion. From the VE's observation that all employer's have "quotas" and "production issues," and her later testimony that certain positions did not require fast-paced work, it is clear that the VE was referring to the simple requirement that individuals be sufficiently productive in order to maintain employment. This is an issue of productivity which may not be dependent on fast pace, but may instead simply require steady effort at a lower pace. An employer's requirement that certain levels of

productivity be maintained does not necessarily mean that the work itself is fast-paced, and the VE's assertion that all employers require a certain level of productivity is not inconsistent with her testimony that certain positions she identified did not actually require fast-paced work.

Plaintiff agrees that the VE's testimony as to pace did not eliminate the housekeeping position, but asserts that the ALJ erred in failing to consider whether that position existed in "sufficient numbers." Plaintiff's Opening Brief at 17. This contention fails, because at the fourth step of the disability analysis, it is not necessary to determine whether a claimant's past relevant work exists in significant numbers in the national economy. See 20 C.F.R. §§ 404.1560(b)(3), 416.960(b)(3) (SSA will not consider whether claimant's past relevant work exists in significant numbers in the national economy).

Plaintiff also contends that this action must at least be remanded pursuant to Massachi v. Astrue, 486 F.3d 1149 (9th Cir. 2007) because the ALJ failed to ask the VE whether her testimony was consistent with the DOT. That requirement is based upon SSR 00-4p, which provides that, when a VE testifies concerning the requirements of a job or occupation, an ALJ has an "affirmative responsibility to ask about any possible conflict between" the VE's evidence and the information provided in the DOT. This Ruling further provides that an ALJ "will ask" the VE if the evidence he or she has provided "is consistent with the DOT, and obtain a reasonable explanation for any apparent conflict."

In Massachi, the Ninth Circuit for the first time addressed the question "whether, in light of the requirements of SSR 00-4p, an ALJ may rely on a vocational expert's testimony regarding the requirements of a particular job without first inquiring whether the testimony

conflicts with the *Dictionary of Occupational Titles*." Id. at 1152. The Massachi court held that "an ALJ may not." Id.

Plaintiff's hearing before the ALJ was conducted before the Massachi decision was issued. From the transcript of the hearing, it is obvious that the ALJ was well aware of the significance of the DOT, because he asked the VE for the numbers in which various jobs existed according to that source. However, he did not ask the VE whether her testimony was consistent with the DOT.

Based upon a careful review of both the hearing transcript and the Massachi decision, I conclude that the ALJ's failure to ask the VE whether her testimony was consistent with the DOT was at most harmless error. The Massachi court held that an ALJ must inquire as to whether a VE's testimony conflicts with the DOT, and remanded the action before it so that this inquiry could be performed. However, the court noted that this sort of "procedural error" may be "harmless" if there is no conflict between the VE's testimony and the DOT, or if the VE provides sufficient support for her conclusions "to justify any potential conflicts . . . ." Id. at 1154 n. 19.

In Massachi, the VE's failure to inquire was not harmless because the court concluded that there was "an apparent conflict with no basis for the vocational expert's deviation." Id. Here, however, plaintiff has identified no actual inconsistency between the VE's testimony concerning the demands of the housekeeping position and the DOT, and no inconsistency is apparent. Instead, the DOT does not state that the housekeeper position requires fast-paced work. See DOT #323.687-014 (housekeeper).

The Commissioner correctly notes that plaintiff bears the burden of showing that a legal error was prejudicial. See Shinseki v. Sanders, 129 S. Ct. 1696, 1706 (2009). She has

not done so. The ALJ's failure to inquire as to any possible conflicts between the VE's testimony and the DOT constituted at most harmless error.

b.  ALJ's Conclusion at Step Five that Plaintiff Could Perform "Other Work"

At step five, the ALJ found that plaintiff could work in a janitorial or laundry worker position. This conclusion was based upon the VE's testimony that these positions did not require workers to "move fast" during "any significant periods of time. . . ."

Plaintiff contends that the ALJ erred in concluding that she could perform these jobs because the preclusion of any fast-paced work in the ALJ's RFC and hypothetical was inconsistent with the ALJ's queries about whether the laundry and janitorial positions required "no significant" amount of work at a fast pace. In the context of his questioning of the VE about those positions, the ALJ interpreted his general preclusion of "fast-paced" work as allowing for at least a very minimal amount of fast-paced work. The VE understood that this is what the ALJ meant, and testified that at least half of the jobs in these positions could be performed at a "leisurely" pace.

The ALJ's conclusion that plaintiff could perform jobs that required no more than an insignificant amount of fast-paced work is supported by substantial evidence in the record. His conclusion that the laundry and janitorial positions did not require a significant amount of fast-paced work is well supported by the VE's testimony. Under these circumstances, the ALJ did not err in concluding at step five that plaintiff could perform "other work" that existed in substantial numbers in the national economy.

As with the above discussion of the step four analysis, I conclude that the ALJ's failure to ask the VE whether her testimony was consistent with the DOT was harmless error

at step five.  Plaintiff has cited no inconsistency between the VE's testimony about the requirements of the laundry and janitorial positions and the description of those positions in the DOT.

## 2. ALJ's Assessment of the Medical Evidence

### a. ME's failure to consider all the evidence

Plaintiff correctly notes that the hearing transcript confirms that the ME did not receive and review records of Dr. Wong-Ngan's neuropsychological evaluation before the hearing.  She notes that Dr. Wong-Ngan performed "the only psychological evaluation that included substantive testing," and contends that the action should be remanded for further proceedings because "It is unknown whether this might have changed the ME's mind about Plaintiff's diagnoses of personality disorder and paranoid schizophrenia."

I disagree.  Based upon the cognitive testing she performed, Dr. Wong-Ngan concluded that there was no evidence that plaintiff had a learning disability or a cognitive impairment.  At the hearing, the ALJ offered plaintiff's counsel the opportunity to make the ME aware of any "additional items" in Dr. Wong-Ngan's evaluation that he thought were significant both when plaintiff testified and when the ME testified.  Plaintiff's counsel agreed to this procedure.  Plaintiff now cites, and I have found in the transcript, no evidence that plaintiff's counsel attempted to make the ME aware of any information from the neuropsychological evaluation.  Under these circumstances, the absence of the neuropsychological evaluation from the material provided for the ME's review does not require remand of this action for further proceedings.

b. <u>Dr. Wong-Ngan</u>

Plaintiff contends that the ALJ "misunderstood the issue of the validity of the MMPI-2" that Dr. Wong-Ngan had administered, "as evidenced by his failure to discuss Dr. Wong-Ngan's explanation of that result." She asserts that the ALJ erred in failing to discuss the possible paranoid schizophrenia that Dr. Wong-Ngan had diagnosed, and in failing to make findings regarding the severity of that impairment.

A careful review of the ALJ's decision does not support the conclusion that the ALJ erred in his analysis of Dr. Wong-Ngan's evaluation. The ALJ discussed Dr. Wong-Ngan's evaluation at length, accurately noted the "questionable validity" of the MMPI-2 results, noted that there was no evidence that plaintiff had a learning disability or cognitive impairment, and noted Dr. Wong-Ngan's diagnoses. In his decision, the ALJ adequately discussed the medical evidence and his reasons for concluding that plaintiff's "severe" impairments consisted of major depression, occasionally associated with psychotic features, and anxiety disorder. The ALJ is the final arbiter in resolving ambiguities and conflicts in the medical record. <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008). In making his determination as to plaintiff's severe impairments and their effects on plaintiff's functional capacity, the ALJ resolved ambiguities and conflicts, and adequately set out his reasons for reaching his conclusions.

c. <u>Dr. Kolilis and Non-Examining Reviewers</u>

As noted above, in his most recent evaluation, Dr. Kolilis diagnosed Adjustment Disorder with Depressed Mood, improved; Personality Disorder NOS, With Borderline, Dependent, and Antisocial Features. Plaintiff contends that underlying decision should be

reversed because the ALJ erred in failing to make any findings as to a personality disorder, which was also assessed by DDS non-examining reviewers.

The record does not support this contention. The ALJ specifically noted that plaintiff had been diagnosed with a personality disorder, NOS. In rejecting that diagnosis, and concluding that plaintiff's only severe impairment was a major depressive disorder, the ALJ cited and relied on the ME's testimony, including his testimony that a personality disorder diagnosis was not justified. The ALJ's reliance on the ME's testimony in this respect was reasonable, and his conclusion that plaintiff did not have a personality disorder giving rise to severe mental limitations was supported by the medical record. The ME opined that the longitudinal record did not support a personality disorder diagnosis. The ALJ noted that Dr. Kolilis found plaintiff to be malingering during his first examination. Based upon his second examination, Dr. Kolilis stated that there was no evidence of psychopathology that limited plaintiff's ability to work, and opined that plaintiff could return to work that involved simple tasks.

Two non-examining DDS psychologists, Robert Henry, Ph.D., and Frank Lahman, Ph.D., also diagnosed a personality disorder. Plaintiff contends that the ALJ erred in failing to account for that diagnosis. However, as the Commissioner correctly notes, a plaintiff who has shown that she suffers from a medically determinable impairment bears the burden of establishing that the impairment affects her ability to perform basic work activities. Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001). The Commissioner also correctly notes that plaintiff has not met that burden. Here, as the ALJ noted, the DDS doctors both opined that plaintiff's mental impairments were not "severe." Dr. Lahman noted that plaintiff's attention and concentration were normal, and Dr. Henry opined that plaintiff could

FINDINGS AND RECOMMENDATION - 22

understand and follow at least simple 1-2 step instructions, had very good overall attention and concentration abilities, and functioned in the average range of intellectual abilities.

d. Opinions of Ms. Eastman, Plaintiff's Therapist

Plaintiff contends that the ALJ improperly rejected the opinions of Ms. Eastman, her treating therapist.  I disagree.

As a therapist, Ms. Eastman, is considered an "other source" under SSR 06-03.  An ALJ is required to give specific, germane reasons, which are supported by the record, for rejecting the opinions of such a source.  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

The ALJ met this requirement.  He summarized some of Ms. Eastman's chart notes and her hearing testimony, and explained his conclusion that this testimony did not establish that plaintiff's psychiatric impairments affected her "to the degree required by the listings" at step three.  He observed that Ms. Eastman's description of plaintiff's problems was not consistent with "marked" mental limitations, and that Ms. Eastman did not indicate that plaintiff experienced frequent decompensations.  Many of the ALJ's conclusions, including his acknowledgment that plaintiff suffers from major depression which is occasionally associated with psychotic features, are consistent with Ms. Eastman's testimony.  The ALJ's assessment of plaintiff's residual functional capacity, including the restriction to "object-oriented work" that involves only "simple" tasks, is also consistent with much of Ms. Eastman's testimony.  To the extent that the ALJ rejected Ms. Eastman's assessment, he provided legally sufficient support for doing so.

3. <u>ALJ's Step 2 Finding</u>

Plaintiff contends that the ALJ erred at step two of the disability analysis by finding that "major depression, which is occasionally associated with psychotic features, and anxiety disorder," was her only "severe" impairment. She also contends that the ALJ failed to make any findings as to her paranoia and psychosis.

These contentions fails. As the Commissioner correctly notes a "severe" impairment is one that "significantly limits" an individual's mental or physical ability to perform "basic work activities." 20 C.F. R. §§ 404.1512, 416.912. Plaintiff bears the burden of establishing that she has a severe impairment. <u>Edlund</u>, 253 F.2d at 1159-60. Here, the ALJ relied on the testimony of the ME in concluding that plaintiff's severe impairments did not include the personality disorder that some sources had identified. Citing the medical record and Ms. Eastman's testimony, the ME testified that a diagnosis of personality disorder was not supported by the longitudinal record. This testimony provides a sufficient basis for the ALJ's opinion.

The ALJ addressed the issues of paranoia and psychosis in his finding that plaintiff's major depression was associated with psychotic features and anxiety disorder, and in his RFC which included limitations based upon these impairments.


4. <u>ALJ's Step 3 Finding</u>

As noted above, at the third step of disability analysis, an ALJ must consider whether a plaintiff's impairment "meets or equals" one of the impairments listed in the SSA regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). A plaintiff has the burden of establishing

that an impairment meets or equals an impairment establishing *per se* disability in the Listings. <u>Burch v. Barnhart</u>, 400 F.3d 676, 683 (9th Cir. 2005).

Plaintiff contends that the ALJ's findings at step three were "incomplete" and did not account for her paranoid schizophrenia and personality disorder. I disagree. The ALJ evaluated plaintiff's psychotic tendencies and personality disorder at the third step of his disability analysis, and included psychotic features and anxiety disorder as features of the major depressive disorder he found. In adopting the ME's opinion, the ALJ specifically noted that plaintiff had been diagnosed with a personality disorder, and rejected that diagnosis as inconsistent with the ME's testimony. The ALJ adequately addressed the impairments noted in the medical record, and plaintiff has not met her burden of demonstrating that any of her impairments meets or equals an impairment in the Listings.

## Conclusion

The Commissioner's decision denying plaintiff's request for disability benefits should be AFFIRMED, and a judgment should be entered dismissing this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due March 22 , 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 3rd day of March, 2010.

John Jelderks
U.S. Magistrate Judge